UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 20-CV-21516-COOKE/GOODMAN

MARIE ALTIDOR,

     Plaintiff,

v.

CARNIVAL CORPORATION,
a foreign corporation, d/b/a
CARNIVAL CRUISE LINES,

     Defendant.

_____/

## ORDER ON MOTION TO STRIKE/*DAUBERT* MOTION TO EXCLUDE PLAINTIFF'S EXPERT WITNESSES PAUL TUCKER AND DR. MOYA

Plaintiff Marie Altidor alleges that she was injured while aboard the Carnival *Sensation* when the dangerous condition of the barstool she was seated on caused her to fall. [ECF No. 1]. Plaintiff retained Paul Tucker ("Tucker") as an expert witness on issues relating to engineering. She also listed her treating physician, Dr. Roberto Moya, M.D. ("Dr. Moya"), as an expert witness on issues relating to, among other topics, the cost, scope, and causation of Plaintiff's injuries.

Defendant Carnival filed a *Daubert* motion to exclude the entirety of Tucker's testimony and portions of Dr. Moya's testimony. [ECF No. 77]. Plaintiff filed an opposition response. [ECF No. 81]. Defendant filed a reply. [ECF No. 82]. United States

District Judge Marcia G. Cooke referred the *Daubert* motion to the Undersigned. [ECF No. 96].

As a preliminary matter, Plaintiff asks this Court to strike Defendant's motion for failing to comply with [ECF No. 19] the Court's scheduling order. [ECF No. 81]. Although acknowledging Defendant's untimely filing, the Undersigned will nevertheless reach the merits of Defendant's motion.[1] From a procedural standpoint, Defendant is skating on very thin ice and it is likely that the Undersigned will strike any further Carnival-filed untimely motions or submissions on matters referred to me in this case.

Upon reaching the merits of Defendant's motion, for the reasons discussed below, the Undersigned **denies** the motion in part and **denies it without prejudice** in part. Both Tucker and Dr. Moya, contrary to Defendant's assertions, are qualified to testify as to their core opinions. There are portions of Tucker's opinions which Defendant seeks to

---

[1]    Given Defendant's filing history, the Undersigned does not make this ruling without some reservation. Defendant has *already* been warned by this Court about the importance of complying with the Court's deadlines, as well as the Local Rules. [ECF No. 93]. The Undersigned echoes Judge Cooke's sentiments and reminds Defendant that the deadlines are not suggestions and that further violations may result in sanctions.

Defendant's summary judgment was denied without prejudice because the supporting statement of material facts and supporting materials were filed after expiration of the summary judgment motion deadline. That procedural mistake is precisely the mistake Defendant Carnival made again here; it timely filed its *Daubert* motion on February 26, 2021 (on the very last day permissible) but untimely filed the supporting exhibits on March 1, 2021, after the deadline to file *Daubert* motions expired. Similar to its mistake with the summary judgment motion, Carnival did not file a motion for leave to file its supporting materials after the deadline expired. To continue with the metaphor used above, the ice under Carnival's litigation skates has now melted.

exclude, however, where there is an insufficient factual record for the Undersigned to determine whether the opinion is sufficiently reliable. Therefore, Defendant may raise the objection again at trial, where Judge Cooke, having the benefit of the trial record and seeing the context of the evidence as it actually unfolds, will be able to determine reliability.

The Undersigned will provide a more-comprehensive discussion of the facts and legal principles and then analyze the *Daubert* challenge.

## I.   Factual Background

The Undersigned will divide this section into three parts: (1) Factual Allegations; (2) Tucker's Expert Report; and (3) Dr. Moya's Opinions.

### a.   Relevant Factual Allegations

Celebrating her birthday, Plaintiff went on a cruise aboard the Carnival *Sensation* in April 2019. [ECF No. 100-1, pp. 49-50]. The cruise lasted from April 18, 2019 through April 22, 2019. *Id.* at 51.

On April 19, 2019, late in the evening, Plaintiff and her friend entered the Michelangelo Lounge, which is aboard the ship. *Id.* at 60-61. Among other things, the Michelangelo Lounge contains a bar top surrounded by multiple barstools. *Id.* at 62-63. After Plaintiff and her friend entered, Plaintiff's friend saw an acquaintance and stepped away. *Id.* at 61.

While Plaintiff's friend was speaking with other people, Plaintiff decided to sit

down on one of the nearby barstools. *Id.* at 63. As Plaintiff was trying to sit down, the "stool top flew [her] off to the floor." *Id.*

As the stool "flew [her] to the ground," Plaintiff's left shoulder was struck and her left butt cheek and back hit the ground. *Id.* at 66. During the fall, "the top part [of the barstool] just flew off." *Id.* at 67. Plaintiff is unable to remember which specific portions of the barstool fell to the ground with her. *Id.* at 70. A Carnival employee collected the detached piece of the barstool. *Id.* at 74.

Carnival generated a work request with the subject described as "[b]ar chair in Michael angelo loose from base." [ECF No. 78-3]. The "type description" of the request was "carpentry, upholstery, masonry, [and] painting." *Id.*

During the pendency of the litigation, Carnival had Ayran Caling ("Caling"), a security officer, assist with an inspection of the barstools in the Michelangelo Lounge. [ECF No. 81-2]. During the inspection, Caling screwed and unscrewed multiple barstools to display the type of screw in each barstool and to display the manner in which they were screwed together. *Id.* Caling admits that he is not qualified to fix anything, and Defendant has other people to fix those kinds of problems. *Id.* at 23-24. Caling reassembled the barstools at the end of the inspection. *Id.* at 22.

　　b. Tucker's Expert Report[2]

---

[2]　　All portions of this section are derived from Tucker's Report and attached *Curriculum Vitae*. [ECF No. 78-2].

i.  Tucker's *Curriculum Vitae*

Tucker's *Curriculum Vitae* ("CV") is lengthy and need not be cited verbatim. However, his licensures, education, professional affiliations, and work-history are important to mention. Tucker is licensed as a professional engineer in eleven different states, including Florida, and has a Bachelor of Science in Civil Engineering and a Master of Science in Structural Engineering. Additionally, he is currently pursuing a Ph.D. in Biosystems Engineering.

Since 1999, Tucker has worked as an engineer in a variety of roles, including senior engineer, structural engineer, project manager, and owner/partner of engineering companies. He is also a member of the following professional organizations: National Academy of Forensic Engineers, National Society of Professional Engineers, Florida Engineering Society, Florida Structural Engineers Associations, Tennessee Society of Professional Engineers, Structural Engineering Institute, American Society of Civil Engineers, American Society of Testing and Materials, Fenestration Glazing Industry Alliance, American Institute of Steel Construction, and American Concrete Institute.

ii.  Tucker's Factual Determinations

As part of Tucker's Report, he details the factual conclusions he was able to make based on the evidence, documents, and publications he reviewed. Tucker first provides a description of the barstool:

> The barstool seat is constructed of wood and is covered with a leather-like material and the top of the seat is approximately 30½-inches above the floor.

The seat is attached to the metal rotational assembly with four (4) screws. The seat rotates freely on the rotational assembly. The rotational assembly is designed to allow the seat to rotate while the rotational assembly itself is intended to be fixed to the base providing no rotation between the base and the rotational assembly. The base's surface was roughened where the base contacts the rotational assembly, which helps prevent movement between the base and the rotational assembly, when the screw is correctly torqued. The base and rotational assembly were designed to be fastened together with a single screw.

Next, Tucker describes the screws present in the 15 Michelangelo Lounge barstools, including the subject screw. Tucker notes that the subject screw was approximately 1 3/8 inches in length, had a pan headed type Phillips head, had threads covering about 1 1/8 inches of the screw, with the 3/8 inches of thread nearest the head being worn and damaged, was cut to this length, and was accompanied by a washer.

Tucker compared and contrasted this screw with the screws in the other barstools, highlighting that it was the longest of the measured screws, and had the most wear and damage of the screws, and was in a barstool with a hole larger than the diameter of the screw and accompanied by a blackened lubricant. Tucker also indicates the subject screw is not a hex-headed screw, which is the ideal type of screw due to the available torque.

Finally, Tucker describes the condition of the barstool in which the subject screw was being used. His description of the barstool includes observations of the wear along the edges of the surface that directly contacts the base, which match up between the top surface of the barstool's base and the worn surface of the rotational assembly.

   iii. <u>Tucker's Opinions</u>

Tucker provides his opinions in the "engineering evaluation" and "conclusion" sections of his report. Tucker begins by stating the subject screw was too long to provide adequate contact with the base and that the screw had been cut shorter to decrease its length. He also noted that a washer had been installed.

Tucker further opined that the subject screw was the screw present during Plaintiff's alleged incident. Tucker bases this opinion on the wear and damage to the screw. In discussing the wear and damage to the screw, Tucker describes the manner in which screws function in a barstool, the extent of the thread damage, and the reduced use of the barstool during the COVID-19 pandemic.

Tucker next alleges that the nature of the screw and barstool in conjunction caused both the rotational assembly and base surface to wear from the friction. He claims lubricant was added to the base to prevent squeaking when the metals rubbed together.

Tucker ultimately concludes that Defendant failed to repair and maintain the subject barstool to an appropriate standard of care. Tucker bases this opinion on the type and length of the screw, as well as the damage both to the screw and to the barstool, which was caused by the subject screw. Tucker opines that, in part, the presence of lubricant indicates Defendant's knowledge regarding these issues.

c.  <u>Dr. Moya's Report</u>[3]

---

[3]    All portions of this section are derived from Plaintiff's Rule 26(a)(2)(B) disclosure. [ECF No. 81-1].

i.  Dr. Moya's *Curriculum Vitae*

In 1975, Dr. Moya received his medical degree from the University of Zaragoza, located in Zaragoza, Spain. After receiving his medical degree, he completed five years of graduate education at three facilities in Miami, the Miami Heart Institute, the Mount Sinai Medical Center, and the Miami Children's Hospital.

After completing his final graduate program, Dr. Moya spent ten years as an Orthopedic Surgeon with a Professional Partnership. Following that, Dr. Moya began working as a solo practitioner in 1990 and, as of Plaintiff's Rule 26(a)(2)(B) disclosure, is still employed in that capacity.

Dr. Moya has testified or given a deposition in more than 50 cases. He is a member of the American Medical Association, Dade County Medical Association, and South Florida Orthopedic Association. Additionally, Dr. Moya has received certifications from the Educational Commission of Foreign Medical Graduates, the State of Florida Board of Medical Examiners, the American Board of Orthopedic Surgeons, and in Florida Worker's Compensation. He has also completed over 1,300 hours of post-graduate continuing education.

In the past, Dr. Moya has been appointed to a variety of medical boards and departments. He also teaches or has taught at Barry University and Nova Southeastern University.

ii.  Dr. Moya's Opinions Relevant to Defendant's Motion.

8

Dr. Moya opines as to Plaintiff's possible necessary future medical treatment. Specifically, he notes that Plaintiff "**may** incur" certain medical costs. When discussing individual medical treatments, Dr. Moya also includes the estimated price of the treatment.

Dr. Moya opines the following medical treatment may be necessary:

(1) Physical Therapy for acute flare-ups to control pain. The estimated cost is $2,500 to $3,000 annually, depending on complexity of pain.

(2) Chronic anti-inflammatory and pain medication. The estimated cost is $1,500 to $2,000 annually, and requires periodic monitoring.

(3) Lumbar trigger point, epidural steroid, or facet/medical branch block injections. Typically, there are three injections and the injections may be repeated up to twice annually. The estimated cost is $2,000 to $15,000 per injection.

(4) Lumbar spine surgery for lumbar facet ablation at 3 levels. The estimated cost is $55,000 to $85,000, depending on factors such as patient's age, history, and the operating room time.

(5) Lumber spine surgery for lumbar discectomy and fusion at L4-L5. The estimated cost is $60,000 to $225,000, depending on factors such as patient's age, history, and the operating room time.

(6) Arthroscopic surgery of the left shoulder. The estimated cost is $55,000 to $85,000, depending on factors such as patient's age, history, and the operating room time.

## II.    Applicable Legal Principles

The district court has "broad discretion in determining whether to admit or exclude expert testimony, and its decision will be disturbed on appeal only if it is

manifestly erroneous." *Evans v. Mathis Funeral Home*, 996 F.2d 266, 268 (11th Cir. 1993).

Federal Rule of Evidence 702 governs the admission of expert testimony, as explained

and refined by the United States Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.*,

509 U.S. 579, 582 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). Under

this framework, district courts are charged with a gatekeeping function "to ensure that

speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter

Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002).

> Rule 702 provides that:
>
> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

To fulfill its obligation under *Daubert*, a trial court engages in a three-part inquiry:

(1) whether the expert is qualified to testify competently; (2) whether the methodology

used to reach the conclusions is sufficiently reliable; and (3) whether the testimony assists

the trier of fact to understand the evidence or to determine a fact at issue. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005).

As an overarching principle, the district court must "ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey*, 298 F.3d at 1256. "In order to be admissible, an expert's testimony must be based on 'more than subjective belief or unsupported speculation.'" *Haggerty v. Upjohn Co.*, 950 F. Supp. 1160, 1167 (S.D. Fla. 1996) (quoting *Daubert*, 509 U.S. at 590). There should be "[s]cientific method; good grounds and appropriate validation." *U.S. v. Masferrer*, 367 F. Supp. 2d 1365, 1371 (S.D. Fla. 2005).

Reliability of the methodology requires "an exacting analysis of the proffered expert's methodology." *McCorvey*, 298 F.3d at 1257. That analysis takes into consideration a number of factors, including: (1) whether the expert's methodology can be, and has been, tested; (2) whether the expert's scientific technique has been subjected to peer review and publication; (3) whether the method employed has a known rate of error; and (4) whether the technique is generally accepted in the scientific community. *Rink*, 400 F.3d at 1292; *see also Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).

These reliability factors, however, are non-exhaustive. *Kumho Tire*, 526 U.S. at 150; *Rink*, 400 F.3d at 1292. Thus, "[i]n evaluating the reliability of an expert's method . . . a district court may properly consider whether the expert's methodology has been contrived to reach a particular result." *Rink*, 400 F.3d at 1293 n.7. The burden of

11

establishing the reliability of an expert's opinions rests on the proponent of that expert's testimony. *U.S. v. Frazier*, 387 F.3d 1244, 1244 (11th Cir. 2004). The party proffering the expert also has the burden of "laying the proper foundation for the admission of the expert testimony . . . and admissibility must be shown by a preponderance of the evidence." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).

"It is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC–8, Inc.*, 326 F.3d at 1341. Thus, the district court cannot exclude an expert because it believes the expert lacks personal credibility. *Rink*, 400 F.3d at 1293 n.7. To the contrary, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech. DC–8, Inc.*, 326 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596).

A less-than-perfect expert opinion may still be admitted, even if it contains gaps. *See In re Trasylol Prods. Liab. Litig.*, No. 08–MD–01928, 2010 WL 1489793, at *6 (S.D. Fla. Feb. 24, 2010) ("Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded.").

Furthermore, courts "must be careful not to conflate questions of admissibility of expert testimony with the weight appropriately to be accorded to such testimony by the fact finder." *Id.* at *7 (quoting *Quiet Tech*, 326 F.3d at 1341).

On the other hand, courts do not hesitate to exclude purported expert testimony which does not pass muster. *See Allison v. McGhan Medical Corp.*, 184 F.3d 1300 (11th Cir. 1999) (affirming summary judgment in favor of silicone breast implant manufacturers and upholding district court's exclusion of proffered expert's causation testimony under *Daubert*); *Rink*, 400 F.3d at 1286 (affirming exclusion of expert testimony in products liability and toxic trespass claims against pesticide manufacturer and therefore affirming summary judgment for defendant); *United States v. Frazier*, 387 F.3d 1244 (11th Cir. 2004) (finding trial court in criminal case did not abuse its discretion in excluding proffered expert testimony from forensic investigator); *Hendrix v. Evenflo Co., Inc.*, 609 F.3d 1183 (11th Cir. 2010) (affirming defense summary judgment for infant car seat manufacturer in products liability lawsuit involving child who sustained traumatic brain injuries and upholding trial court ruling which excluded expert testimony because the experts were not sufficiently reliable).

## III.   Analysis

Defendant seeks to exclude Tucker from testifying at all and alternatively seeks to exclude individual portions of his conclusions. Additionally, Defendant asks this Court to exclude Dr. Moya from testifying about billing costs associated with medical procedures and future medical treatments Plaintiff may need.

Plaintiff asks this Court to deny Defendant's motion on the basis that Defendant did not take depositions of either of the expert witnesses. [ECF No. 81]. Plaintiff supports

this request by citing *Ward v. Carnival Corp.*, No. 17-24628, 2019 WL 1228063 (S.D. Fla. Mar. 14, 2019) and *Continental Motors, Inc. v Jewell Aircraft, Inc.*, No. 12-0221, 2013 WL 5530842 (M.D. Ala. Oct. 4, 2013) as authority for the proposition that "[c]ourts generally will deny a Daubert Motion when the party seeking to exclude evidence choose not to seek a deposition." [ECF No. 81, p. 3].

This is not the holding of these cases, nor is a deposition a prerequisite to filing a *Daubert* motion. When an expert report provides sufficient information, a party "[does] not need to first attain additional information through a deposition to challenge the reliability of Plaintiff's expert." *Golden v. Carnival Corp.*, No. 14-24899, 2016 WL 11547358, at *7 (S.D. Fla. Mar. 18, 2016).

The Undersigned notes, however, that many of the rhetorical questions presented in Defendant's motion are questions that could (and likely should) have been asked during a deposition.[4] Adopting United States Magistrate Judge Torres' rationale in *Ward*, the Undersigned would be "remiss" if I failed to acknowledge that Defendant elected not

---

[4]     The Undersigned is unpersuaded by Defendant's argument that it was "effectively preclude[ed] from [] deposing [Tucker] or securing a rebuttal expert." [ECF No. 77]. Plaintiff filed a motion to extend the deadline to list expert witnesses until February 19, 2021, which the Court granted. [ECF Nos. 40; 41]. Plaintiff complied with the deadline. Defendant presents no case law holding that a party can be prejudiced due to the opposing party's *compliance* with deadlines. Defendant could have sought an extension to complete the deposition or it could have attempted to coordinate a deposition with Plaintiff after the discovery cutoff, as is allowed by the Court's Order. [ECF No. 54]. The Undersigned also notes that Court's initial scheduling order requires Plaintiff to make its expert available for deposition within fourteen days of listing. [ECF No. 19]. It appears Defendant made no attempt to avail itself of these opportunities.

14

to take depositions of either of these witnesses. 2019 WL 1228063, at *5. The questions posed by Defendant in its motion would have been more appropriately posed to Plaintiff's experts and the existence of any unexplained "speculation," "guesswork," or "assumptions" is a fault of Defendant's own making. *Id.* Nevertheless, as explained in *Ward*, the Court is "in no way saying that [a party] was *required* to depose" the expert; to the extent Carnival lacks details about the experts' opinions, it seems that this "occurred as a result of [Carnival's] own failure to seek the information," and "not because the expert's process is somehow lacking." *Id.*

      a. <u>Tucker's Qualifications</u>

At the outset, Defendant seeks to exclude the entirety of Tucker's opinions on the basis that "[his] education, training and experience is only in shore-side land-based engineering." [ECF No. 77]. But Defendant concedes "Mr. Tucker is a well-credentialed civil engineer."

Defendant has made no argument about how the barstools in question possess any quality that is unique to barstools aboard a ship. It seems that Defendant asks this Court to find that any object, the moment it is placed on a ship, necessitates special adaptation beyond the understanding of a civil engineer with multiple degrees and decades of relevant experience. The Court is unwilling make this leap, as there is nothing about this incident that makes it uniquely maritime. *See e.g. Goins v. Royal Caribbean Cruise, Ltd.*, No. 16-21368, 2017 WL 5891469, at *2 (S.D. Fla. May 31, 2017) (finding a civil engineer, who

was not licensed as a marine or naval engineer, competent to testify as to a slip and fall on a boat that was no different than a land-based slip and fall); *Peck v. Carnival Corp.*, No. 16-20214, 2017 WL 7726728, at *3 (S.D. Fla. July 13, 2017) (finding a licensed architect, despite having no special education, experience or specialized knowledge related to oceangoing vessels, competent to testify as to stairs that were in no way uniquely maritime).

This defense argument is additionally undermined by the fact that Defendant saw it fit to task a security guard (who admits he has no experience in maintenance of fixtures) with disassembling and reassembling the barstools in the Michelangelo lounge.

"'Rule 702 contemplates a broad conception of expert qualifications[,]' as is evidenced by the advisory committee notes thereto 'emphasiz[ing] that Rule 702 is broadly phrased and intended to embrace more than a narrow definition of qualified expert.'" *Peck*, 2017 WL 7726728, at *2 (quoting *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004)) (alterations in original). There is no stringent requirement: so long as the expert is minimally qualified, objections go to the credibility and weight of the testimony, not its admissibility. *Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009).

As explained, Tucker has extensive educational and practical experience relevant to the subject matter. In addition, he has attended a number of specialized courses and is a university lecturer on the topics of: Construction Management and Methods,

Construction Engineering II, CADD Applications for Civil Engineers, Structural Systems, Analysis of Framed Structures, Structural Steel Connection Design, and Behavior of Steel Structures. The Undersigned is satisfied that Tucker is qualified to testify regarding the workings of a barstool with no identified special or unique properties. The Undersigned **denies** Defendant's request to exclude Tucker's testimony based on a purported lack of expertise.

        b.  <u>Reliability of Tucker's Methods</u>

Defendant argues that there is simply too great an analytical gap between the data and Tucker's proffered opinion. [ECF No. 77]. Plaintiff counters that Tucker states in his report that "[t]he opinion and conclusions expressed in this report are based upon a review of the material currently available to us, as well as our knowledge, education, training, and experience in mechanical engineering, forensic engineering and accident reconstruction, and have been reached within a reasonable degree of engineering certainty." [ECF No. 81]. In reply, Defendant argues that this "magic language" does not somehow make Tucker's opinions reliable. [ECF No. 82].

Defendant's argument does not hold water and it attempts to discount Tucker's statements by isolating them. In the context of reliability, trial courts are given "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Adams v. Laboratory Corp. of America*, 760 F.3d 1322, 1327 (11th Cir. 2014) (quoting *Kumho Tire*, 526 U.S. at 152). "[T]he proponent of

the testimony does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence, it is reliable." *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1313 (11th Cir. 1999).

While the *Daubert* framework is helpful to determine reliability, it does not mandate that every factor in *Daubert* be satisfied. *Kumho Tire*, 526 U.S. at 150-51. The Court has broad discretion, not only in determining an expert's reliability, but also in *how* to examine an expert's reliability. *Id.* Regardless of whether Tucker wrote the purportedly "magic language," he has also, from a substantive perspective, sufficiently explained that his opinions are based on the evidence provided to him (e.g., the videos and depositions), various industry materials (e.g., the *International Building Code* and the various ASTMs), his substantial education, and his extensive practical experience.

Defendant is, again, hamstrung by its decision not to take Tucker's deposition. Instead of pointing to flaws, inconsistencies, or actual analytical gaps in Tucker's methodology, Defendant is left to making conclusory statements that Tucker's methods are unreliable.

There is no "magic language" an expert is required to use, and the Undersigned finds that Tucker appropriately based his opinions on reliable methodology. Defendant, indeed, has not even contended that Tucker's educational experience or the industry materials reviewed are unreliable, just that they are not applicable to *ship* used barstools.

The Undersigned will next address each of Defendant's individual requests to exclude portions of Tucker's testimony.

  i. <u>The Identity of the Subject Screw as the Screw Used During Plaintiff's Alleged Fall.</u>

Defendant claims there is a "galactic analytical gap" between the evidence and Tucker's "unsupported assumption" that the subject screw is, in fact, the same screw that was in the barstool during Plaintiff's alleged fall. Plaintiff, in turn, argues that the circumstances of the inspection and Carnival's own admissions, combined with Tucker's analysis, are sufficiently reliable.[5]

At the beginning of Tucker's report, he defines and provides a comprehensive analysis of a barstool's mechanics. Additionally, Tucker gives a breakdown on the types of, and differences between, screws and bolts.

After outlining the subject matter's foundation, Tucker details his observations from the inspection videos. He details the type, length, and relative wear and tear of each of the examined screws. Then, Tucker describes the function of the screws within the barstools, while also providing additional remarks about the state of the damage to the barstools and presence of additional substances.

---

[5] Plaintiff, in her argument, also accuses Defendant of Spoliation. A *Daubert* motion response is an inappropriate forum to raise such a claim. Plaintiff fails to even request a remedy for the alleged violation. In the absence of a specific spoliation-based motion, the Undersigned declines to address this spoliation allegation any further.

Tucker next gives his assessment of the subject screw. Tucker's assessment of the screw takes into account the following factors: (1) the subject screw's characteristics; (2) the impact those characteristics have on the mechanics of a barstool; (3) the likely use of the barstool during the COVID-19 Pandemic; and (4) the characteristics of the barstool in which the subject screw was placed. In particular, Tucker emphasizes the damage to the screw, the amount of time it would take for that damage to occur given the manner in which a barstool operates, the damage to the barstool, and the presence of lubricant on the barstool.

Based on this analysis, Tucker opines that "the subject screw is likely the screw which was installed in the barstool on the date of the alleged accident." [ECF No. 78-2]. The Undersigned believes Tucker's methodology is reliable based on the evidence reviewed, the extent of his analysis, and Tucker's education and experience in civil engineering.

Plaintiff need only meet this burden by a preponderance of the evidence. *Allison* 184 F.3d at 1306. Defendant has failed to counter the reliability of Tucker's methodology and, instead, relies on the arguments of its attorneys rather than any record evidence. *Latele Tele., C.A. v. Telemundo Commc'ns Grp., LLC*, No. 12-22539, 2014 WL 7272974, *7 (S.D. Fla. Dec. 18, 2014) ("Rhetoric and attorney argument are no substitute for record evidence."). The Court's gatekeeper role is not intended to supplant that of the jury: "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction

on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Allison*, 184 F.3d at 1311 (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993)) (alterations in original).

Certainly, Defendant can challenge Tucker's opinions on this issue during trial, as it also could have done, had it chosen to, during deposition. Defendant's qualms and additional questions, however, do not necessitate a finding that Tucker's opinion on the subject screw is unreliable. The Undersigned **denies** Defendant's request to exclude Tucker's opinion on this issue.

ii.  Presence of Lubricant on the Barstool

The next portion of Tucker's testimony Defendant seeks to have this Court exclude is Tucker's opinion/observation that there was lubricant on the barstool during the inspection *and* when the incident occurred. In its motion, Defendant contends that Tucker cannot know whether there was lubricant because he could not touch, feel, or smell lubricant. [ECF No. 77]. Plaintiff says there is nothing unique about Tucker's determination and it is clear from the video inspection that lubricant was applied to the barstool in question. [ECF No. 81]. Defendant, still not conceding the existence of lubricant, replies that even if there was lubricant, nobody can know when or why it was applied. [ECF No. 82].

In the portions of Tucker's report referencing lubricant, he makes the following observations/conclusions:

21

> The scarifications [on the subject barstool] can be witnessed on the base as well as a blackened lubricant (photograph 8) . . . The rotational assembly was rotating on the base for so long that the rotational assembly and base surface were both worn from the friction. Likewise, lubricant was added to the base to prevent squeaking when the metals rubbed and to allow smoother rotation . . . The author opines that Carnival Cruise lines was aware the barstool did not function properly because lubricant was placed between the rotational assembly and the base.

[ECF No. 78-2].

As a preliminary matter, the Undersigned rejects Defendant's assertion that Tucker is unable to recognize lubricant or differentiate it from dirt without touching, feeling, or smelling it. If the Undersigned were to take this line of thinking to its logical conclusion, then an individual would be unable to ever offer an opinion on anything he or she viewed through a video. This rationale would necessitate an untenable finding that it is impossible, for example, to know if a surface is wood, steel, plastic, or carpet without having the opportunity to touch, feel, or smell it.

The Undersigned can also not find any direct mention in Tucker's report where he expressly and unequivocally claims that lubricant was present **at the time of the alleged incident.** Tucker's report, however, does seem to implicitly opine that the lubricant's presence indicates that Carnival must have known *at the time* of the incident the barstool was malfunctioning. If this is, in fact, what Tucker is opining (and I am uncertain because the record on the issue is unclear), then the Undersigned is currently unconvinced that the methods in which Tucker reached *this* conclusion are reasonable.

22

Regardless of Tucker's ability to determine that lubricant was present on the barstool at the time of the January 5, 2021 inspection, it seems implausible, if not impossible, for him to be able to conclude—as opposed to speculate—that there must have been lubricant on the barstool April 19, 2019, when the alleged incident occurred. *United States v. Frazier*, 387 F.3d 1244, 1272 (11th Cir. 2004) ("[T]he trial judge's role as gatekeeper is designed to ensure that the jury, in carrying out its prescribed role, bases its determinations on relevant and reliable evidence, rather than on speculation or otherwise unreliable conjecture."). However, due to the underdeveloped factual record, the Undersigned cannot be certain Tucker intends to even offer this opinion.

On these principles, the Undersigned **denies** this aspect of Defendant's motion as to Tucker's opinion regarding the presence of lubricant on the date of the inspection and **denies without prejudice** Defendant's request to prohibit Tucker from testifying as to when the lubricant was placed or whether it was present on the day of the incident, until a sufficient factual record is developed on the issue. *Continental Motors, Inc.*, 2013 WL 5530842, at *8 (denial without prejudice is appropriate where there is an insufficient factual record to address the reliability of an expert's methodology).

### iii.   The Length of the Subject Screw

Referring to the opinion as conjecture, Defendant next asks this Court to strike Tucker's opinion regarding the length of the screw, questioning how somebody could know a screw is too long without knowing how deep the hole is. [ECF No. 77]. Plaintiff

responds that Tucker noted the screw had been cut, a washer had been used, and [t]he subject screw, when tightened, allowed the rotational assembly to rotate on the base when the seat was rotated." [ECF No. 81].

In Tucker's report, he discusses the comparative length of the screws used in 14 of the 15 barstools (one inch in 11 of the 15 barstools, 7/8 inches in 2 of the 15 barstools, and 1 3/8 inches in one of the 15 barstools). Additionally, Tucker references a photograph (titled "[d]istance subject screw projects through base") showing the subject screw protruding 7/8 inches above the top of the base. He expresses this opinion in the context of the frictional wear seen on both the rotational assembly and the base of the barstool.

Without a sufficient factual record, the Undersigned cannot say whether these factors serve as the basis for Tucker's opinion, whether they are reliable, or whether they are even relevant.

But, the Undersigned has only Tucker's Report on which to base my findings. Federal Rule of Civil Procedure 26(a)(2)(B) requires an expert report contain the following:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
>
> (ii) the data or other information considered by the witness in forming them;
>
> (iii) any exhibits that will be used to summarize or support them;
>
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

24

(v) a list of all other cases in which, during the previous four years, the witness testified as an expert at trial or by deposition; and

(vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B). Tucker's report meets these requirements and Defendant has not timely moved to strike the report as insufficient. It would be inappropriate to strike this aspect of Tucker's testimony without him being given an opportunity to explain or elaborate on the issue. Without additional evidence (which presumably could have been developed in a deposition), there is just as much a possibility that the opinion could be either reliable or unreliable.

Due to the lack of a sufficient factual record, the Undersigned **denies without prejudice** this aspect of Defendant's motion.

### iv.   Tucker's Reliance on Various Materials

Defendant suggests this Court should "properly preclude[] Mr. Tucker from testifying that the ASTM or international property codes apply to the *Carnival Sensation*." [ECF No. 77]. Plaintiff responds by arguing these standards are admissible as bearing on the standard of care in determining negligence. [ECF No. 81].

Defendant argues that *Amy v. Carnival Corp.*, 360 F. Supp 3d 1345 (S.D. Fla. 2018) and *Fylling v. Royal Caribbean Cruises*, No. 18-CV-21953, 2019 WL 8760909 (S.D. Fla. June 13, 2019) are "on-point" and should guide the Court's analysis. Plaintiff provides

*Holderbaum v. Carnival Corp.*, 87 F. Supp. 3d 1345 (S.D. Fla. 2015) as a basis for its opposition. The Undersigned will address each of those cases in turn.

Defendant's reliance on *Amy* is concerning. Not only is the relevant portion of the opinion *dicta*, but the case was **reversed** by the Eleventh Circuit and no mention is made of this in Defendant's motion or reply. *See Amy v. Carnival Corporation*, 961 F.3d 1303 (11th Cir. 2020). *Amy* involved a three-year old child who fell over or through railing meant to prevent cruise passengers from falling to the beneath deck. *Amy*, 260 F. Supp at 1349. The court determined that the plaintiff's expert's reliance on the IBC and NFPA did not, as a matter of law, establish constructive notice because they are voluntary, non-binding standards. *Id*. at 1356. In a footnote, the *Amy* Court hinted as *dicta* that these standards would be inadmissible at trial but also acknowledged other district courts have ruled differently.

*Fylling* involved an elderly 71-year old plaintiff who tripped through an entranceway due to conditions and hazards related to the ramp area. 2019 WL 8760909, at *1. The Court, citing to *Amy*, held that ASTM F1637-95 is inadmissible as a land-based non-binding standard related to *safe walking surfaces*. *Id*. at * 5.

In Plaintiff's provided case, *Holderbaum*, the plaintiff's shoe caught a metal strip on the top stair, causing her to fall down the stairs. 87 F. Supp. 3d at 1348. The *Holderbaum* Court, in denying the defendant's summary judgment motion, considered evidence of ASTM 1637-95, stating, "the law in the Eleventh Circuit, as established by the former Fifth

Circuit, is that advisory guidelines and recommendations, while not conclusive, are admissible as bearing on the standard of care in determining negligence." *Id.* at 1358.

The Undersigned is persuaded by the reasoning in *Holderbaum*, for both its logic and its consistency with other cases in this district. Here, while Defendant claims these codes are completely inapplicable to maritime issues, it has failed to identify how this issue is at all uniquely maritime. *Peck v. Carnival Corp.*, 2017 WL 7726728, at *6 (allowing an expert to rely on International Building Codes, stating "even if the standards utilized by [the expert] in the formation of his opinions are not mandatory on cruise ships, [the expert's] explanation regarding passengers' expectation pertaining to stairway design based upon standards accepted by the international community of architects is reliable.").

"Additionally, where the hazard alleged is not unique to the maritime environment, it is not necessary to apply only maritime standards (which seemingly do not exist)." *Id.* When an injury is of the type that could occur on land and does, in fact, occur in similar ways also on land, such standards, even if not exclusively maritime, are admissible and relevant. *Cook v. Royal Caribbean Cruises, Ltd.*, No. 11-20723, 2012 WL 1792628, at *4 (S.D. Fla. May 15, 2012).

Because Defendant's motion only contests Tucker's reliance on ASTM or *International Property Maintenance Codes*, the Undersigned will address only those materials. The ASTM codes relied on by Tucker involve codes related exclusively to the function of, among other similar topics, threaded fasteners, washers, direct tension, bolts,

screws, studs, and tensile strength. Defendant would be hard-pressed to argue that the threads of screws/bolts—and the science of friction/tension—work differently the moment the item is moved from land to a boat. Again, this incident involves a barstool; to the extent the *International Property Maintenance Code* provides guidance to the standards of barstool construction, the Undersigned is unconvinced it is inapplicable when the barstool is on a boat.

This reasoning is bolstered by the fact that Defendant has not provided any alternative acceptable "exclusively maritime" standards addressing the topics of the materials which Plaintiff's expert relied upon.

The Undersigned finds the materials Tucker relied upon are appropriate and **denies** this facet of Defendant's motion. The Undersigned issues this ruling with the caveat that I am not determining the precise purposes for which these standards are admissible, and the District Court will be able to later determine to what extent Tucker may rely on these materials.

v.  Portions of Tucker's Conclusions

In a Section titled "Mr. Tucker's conclusions are not based on any scientific methodology," Defendant challenges Tucker's conclusions that "lack of maintenance and inadequate repair caused the incident, that the condition would not have been readily observable to [Plaintiff] and a different screw would have cured the problem." [ECF No. 77]. Plaintiff, of course, disagrees. [ECF No. 81].

Tucker addresses the lack of maintenance and inadequate repair only after describing in detail the function of a barstool, the purpose of individual parts of the barstool, and the damage seen on the subject barstool and its individual parts. Defendant is free to challenge these opinions on cross examination, but there is no gap which would preclude their admissibility.

Tucker's statement that the condition would not have been observable to Plaintiff is a commonsense statement. One does not need to be an expert to know that people do not look under or disassemble barstools to determine their functionality before sitting on them. Damage seen only after the barstool was disassembled is obviously not readily observable. Nor would it be farfetched for Tucker to understand a lay person does not know the types of screws meant for barstools to function properly.

Tucker's conclusion about the effect a change in screw type would have on the subject barstool is based on analysis and reason. Tucker first describes the types of screws meant to be used in constructing barstools. Then his report explains why a hex-headed screw is ideal (i.e., it allows for proper torqueing). After this discussion, Tucker advises that a different screw could have cured the issue.

Due to the analysis in Tucker's report, the Undersigned **denies** this aspect of Defendant's motion.

vi.   Wear and Tear of the Subject Screw

Defendant's final challenge to Tucker's testimony is his analysis of the "wear and tear" to the subject screw. [ECF No. 77]. Plaintiff counters that Tucker's conclusion was based on all the available materials and his experience as an engineer. [ECF No. 81].

In making this challenge, Defendant poses a series of hypothetical questions to the court: questions which, again, would be more appropriately posed to Tucker in a deposition. The Undersigned does not discount these questions, as they may very well be appropriate and persuasive to a jury. However, an expert's report needs to comply only with Federal Rule of Civil Procedure 26(a)(2)(B), it need not answer every possible question an opposing party may have.

Tucker's education and professional experience is substantial. Throughout his report, he discusses the function of a barstool, how the subject screw would interact when placed in a barstool, the observable damage to the subject screw's threads, and accounts for the assumed use of the barstool during the COVID-19 pandemic. His conclusion is reasonably sound. If Defendant believes any of the factors considered by Tucker are incorrect, then it can present them at trial

Finding no issue with Tucker's analysis in this regard, the Undersigned **denies** this facet of Defendant's request.

c. Dr. Moya's Qualifications

Dr. Moya began his practice in 1980 and worked as part of a professional partnership for the next ten years. Since that time, Dr. Moya has been a solo practitioner,

operating his own practice for approximately 31 years. Dr. Moya initially received his medical degree in Spain in 1975, following it with three graduate programs at the Miami Heart Institute, Mount Sinai Medical Center, and Miami Children's Hospital.

Dr. Moya holds professional certifications with the Educational Commission of Foreign Medical Graduates, State of Florida Board of Medical Examiners, American Board of Orthopedic Surgeons, and Florida's Worker's Compensation Certification. Additionally, since 1985, Dr. Moya has completed more than 1,300 hours of continuing education in the medical field.

### i.   Likelihood of Future Medical Costs

Defendant asks this Court to preclude Dr. Moya from testifying about future medical expenses Plaintiff may incur as too speculative, stating "[p]ossibilities do not suffice for admissibility." [ECF No. 77]. Defendant asserts this argument because Dr. Moya opined that Plaintiff "may" incur certain future medical costs. Plaintiff responds that Dr. Moya properly couched his opinions with facts and provided a legitimate basis for each of the future medical expenses.

Neither party provided any case law directly addressing this issue.

Plaintiff's Complaint invokes this Court's diversity jurisdiction and its admiralty and/or maritime jurisdiction. [ECF No. 1]. Defendant, however, denies Plaintiff's invocation and concedes only to admiralty jurisdiction. [ECF No. 15].

When admiralty jurisdiction is proper, maritime law applies even if diversity jurisdiction is also applicable. *See Kornberg v. Carnival Cruise Line, Inc.*, 741 F.2d 1332, 1334 (11th Cir. 1984) (despite the fact that the plaintiff alleged diversity jurisdiction, "[s]ince the complained of injury occurred upon a ship in navigable waters, admiralty jurisdiction is also present and maritime law governs the outcome of the suit."); *see also Jackson v. Carnival Cruise Lines, Inc.*, 203 F. Supp. 2d 1367, 1373 (S.D. Fla. 2002) ("Even when, as here, the parties allege diversity of citizenship as a basis of subject matter jurisdiction, if admiralty jurisdiction also exists, federal maritime law governs the substantive issues of the case.")

Maritime law is ordinarily governed by federal law. *See World Tanker Carriers Corp. v. MV Ya Mawlaya*, 99 F.3d 717, 723 (5th Cir. 1996). "But, when neither statutory nor judicially created maritime principles provide an answer to a specific legal question, courts may apply state law provided that the application of state law does not frustrate national interests in having uniformity in admiralty law." *Coastal Fuels Mktg., Inc. v. Florida Express Shipping Co.*, 207 F.3d 1247, 1251 (11th Cir. 2000).

General maritime allows for the recovery of past and future medical expenses. *Consolidated Mach., Inc. v. Protein Products Corp.*, 428 F. Supp 209, 228 (M.D. Fla. 1976); *see also Lobegeiger v. Celebrity Cruises, Inc.*, No. 11-21620-CIV, 2011 WL 3703329 (S.D. Fla. Aug. 23, 2011) (("[Maritime] [p]laintiff is entitled to recover . . . past and future medical expenses.") (quoting *Schumacher v. Cooper*, 850 F. Supp. 438, 453 (D.S.C. 1994)). While

federal common law allows a plaintiff to recover future medical expenses under admiralty jurisdiction, neither the common law nor any statute answers the question of standard for admissibility of such evidence. Therefore, it is appropriate to look to state law.

"Florida law restricts recovery of future medical expenses to those expenses 'reasonably certain' to be incurred." *Volusia Cnty. v. Joynt*, 179 So. 3d 448, 452 (Fla. 5th DCA 2015). This is the standard cited by Defendant in its motion. [ECF No. 77]. However, when an expert opines about future medical expenses, "whatever qualification is placed on the opinion by the expert (i.e., surgery is possible or likely) goes to the weight of the opinion, and not its admissibility." *White v. Westlund*, 624 So. 2d 1148, 1151 (Fla. 4th DCA 1993). A doctor is not *required* to use the phrase "reasonably necessary" to permit her testimony. *Id.* at 1151. ("[A] medical expert may testify that future medical procedures are 'possible' or 'likely,' and need not phrase an opinion in terms of such surgery or treatment being 'reasonably necessary.'").

Applying these principles to the instant action will not frustrate the national desire for uniform admiralty law. In this context, the state law neither raises nor lowers *Daubert's* standards for admissibility of expert testimony. Rather, in a manner consistent with *Daubert*, it leaves the matter of credibility and weight to the jury. *Quiet Tech. DC–8, Inc.*, 326 F.3d at 1341 ("It is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered [expert] evidence.").

Moreover, Defendant has not cited any authority holding that an expert's opinion is permissible only where a future medical cost is *guaranteed* to occur. For example, a doctor could say that a patient *might* require surgery if he does not change his diet. Or, as a more common example, if an infection is not treated, then additional medical intervention via surgery or medicine *may* become necessary.

Further, Defendant has asserted no claim that Dr. Moya is unqualified to offer these opinions, nor does the Undersigned believe he lacks the requisite background. Defendant's argument about the burden is more appropriately presented to a jury, which can accept or reject (or partially accept) the opinion, rather than in a *Daubert* motion.

The Undersigned **denies** this aspect of Defendant's motion.

ii.  Cost of Medical Care

Defendant claims that Dr. Moya is unqualified to testify as to the cost of medical care. [ECF No. 77]. Plaintiff contends, in response, that Dr. Moya has been a doctor since 1975 and he provides a wealth of information in his analysis. [ECF No. 81].

The Undersigned finds Plaintiff's arguments persuasive and Defendant's only cited case is distinguishable from the instant situation.

Dr. Moya's descriptions of the lumbar spine surgeries for lumbar facet ablation and lumbar discectomy and for the arthroscopic surgery of the left shoulder are illustrative that this is not guesswork or an area outside Dr. Moya's knowledge. In each circumstance, he indicates that the estimates include, when applicable, operating room

time, hardware, supply costs, hospital charges, anesthesia fees, and post-surgical equipment. Additionally, he notes that the fees vary based on outside factors such as age, medical history, and operating room time.

Dr. Moya has been a solo practitioner for over three decades. It is difficult to think he would have no understanding of the costs associated with the procedures necessary and part of his practice. If he were not aware, then he would be fully unable to address overhead or provide adequate referrals for patients. Further, the nature of this evaluation and opinion are bolstered by the fact that Plaintiff's medical records include summaries of visits with two other doctors, both of whom included the estimated price of future treatment.

Defendant's sole case is markedly different than the situation in front of this Court. In *Rinker v. Carnival Corp.*, No. 09-23154, 2012 WL 37381 (S.D. Fla. Jan. 6, 2012), the doctor: (1) never treated or spoke with the plaintiff; (2) included conclusions he could provide no factual support for and were outside his expertise (i.e., the cost of an attendant/driver); and (3) were based on the life expectancy of a healthy 62-year-old woman, which the plaintiff, who had stage three colon cancer, was not.

Defendant's argument about the existence of billing professionals, code billing, and medical coding is simply the argument of counsel. Moreover, even if the Undersigned were to consider this as record evidence, the fact that another specialization may be more adept at offering this opinion does not mean Dr. Moya is not qualified.

*Vision I Homeowners Ass'n, Inc.*, 674 F. Supp. 2d at 1325 (qualifications are not a stringent requirement: so long as the expert is minimally qualified, objections go to the credibility and weight of the testimony, not its admissibility). Defendant is free to probe the grounds of Dr. Moya's opinions at trial, on cross-examination.

Based on the foregoing, the Undersigned **denies** this aspect of Defendant's motion.

## IV.    Conclusion

For the reasons discussed above, the Undersigned **denies** Defendant's request to exclude Tucker's testimony as outside the scope of his expertise.

Additionally, the Undersigned **denies** Defendant's request to exclude Tucker's testimony as unreliable.

Further, the Undersigned **denies** Defendant's request to exclude Tucker's testimony about the likelihood of the subject screw being the same screw that was in the barstool during the incident.

The Undersigned also **denies** Defendant's request to exclude Tucker's testimony about the presence of lubricant during the January 5, 2021 inspection and **denies without prejudice**, until a sufficient factual record is created, the exclusion of testimony by Tucker about the presence of lubricant at any time before the January 5, 2021 inspection.

The Undersigned **denies without prejudice** Defendant's request to exclude Tucker's testimony about whether the subject screw was too long until a sufficient factual record is created.

Moreover, the Undersigned **denies** Defendant's request to exclude Tucker's testimony regarding the reviewed ASTMs and the *International Property Maintenance Code*.

The Undersigned additionally **denies** Defendant's request to exclude Tucker's testimony due to lack of scientific methodology.

The Undersigned further **denies** Defendant's request to exclude Tucker's testimony on the wear and tear of the subject screw.

Additionally, the Undersigned **denies** Defendant's request to prohibit Dr. Moya from testifying about future medical necessities.

Last, the Undersigned **denies** Defendant's request to prohibit Dr. Moya from testifying about the estimated cost of medical treatment.

**DONE AND ORDERED** in Chambers, in Miami, Florida, on July 27, 2021.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Marcia G. Cooke
All counsel of record

37